## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **OLIVER ORTOLANI,** | Civil Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **COMMUNITY OF JESUS, INC., ARTS EMPOWERING LIFE, INC., PERFORMING ARTS BUILDING FOUNDATION, INC.,** | **DEMAND FOR A JURY TRIAL** |
| Defendants. | |

Through his attorneys, Plaintiff Oliver Ortolani ("Plaintiff" or "Ortolani") alleges as follows against Defendants Community of Jesus, Inc. (the "Community" or "COJ"), Arts Empowering Life, Inc. ("AEL"), and Performing Arts Building Foundation, Inc. ("PAB") (collectively, "Defendants").

### PRELIMINARY STATEMENT

1. The Community, AEL and PAB are known for intense community cohesion, dedication to the arts, and stunning theatrical performances performed in their magnificent performing arts center (the "Center").

2. The Center, however, was built on the backs of children forced to labor without pay. For almost two years, Plaintiff and several other boys living in the Community were subject to forced labor and trafficking as they constructed the Center, which was built for and funded by Defendants.

3. During their time constructing the Center, Ortolani and the other children had no way of refusing to perform the intense manual labor that Defendants demanded. The worksite was

1

in the middle of a forest, encircled by barbed-wire fences and a locked gate that the boys could not unlock.

4.    The adult Community members who supervised the boys on this commercial job site got them up before 5 a.m., gave them ten minutes for breakfast, kept them working for nine to sixteen hours a day without proper safety gear, training or breaks, assaulted them or had them shunned by the Community when they showed even mild frustration with the harsh regime, kept them out of school while dressing up their grueling manual labor as educational coursework, and hid them from government inspectors when they came to the worksite.

5.    Neither Ortolani nor the other children were compensated for any of this labor, which benefited Defendants by allowing them to hire fewer paid construction workers.

6.    Defendants continue to benefit to this day by being able to use the Center for their own elaborate shows and community events, and, upon information and belief, by receiving payments from other groups holding events at the Center.

7.    Defendants' conduct violates multiple federal and state laws.

8.    Accordingly, Plaintiff now brings this complaint ("Complaint") against Defendants for: forced labor and trafficking pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA") and Massachusetts state law, illegal racketeering in violation of the Racketeer Influenced and Corrupt Actions Act ("RICO"), and unjust enrichment.

9.    Ortolani seeks justice for the forced child labor and emotional distress he was made to endure for formative years of his adolescence, as well as the resultant physical, psychological, and economic injuries.

## PARTIES

10.    Oliver Ortolani is an 18-year-old man. He resides in Post Falls, Idaho. At the time of the events complained of herein, Ortolani was a resident of Orleans, Massachusetts.

11.    The Community of Jesus, Inc. is a domestic religious corporation as defined by M.G.L. c. 180. The Community is duly organized and existing under the laws of Massachusetts and is located at 5 Bay View Drive, Orleans, MA 02653.

12.    Arts Empowering Life, Inc. is a domestic 501(c)(3) organization. AEL is duly organized and existing under the laws of Massachusetts and is located at 129 Rock Harbor Road, Orleans, MA 02653.

13.    Performing Arts Building Foundation, Inc. is a domestic 501(c)(3) organization. PAB is duly organized and existing under the laws of Massachusetts and is located at 18 Anchor Drive, Orleans, MA 02653.[1]

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over Ortolani's federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a)(1).

15.    This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

---

[1] PAB's address on its most recent IRS Form 990 is the same as AEL's address listed on the Massachusetts Secretary of State Business Search. Tax-exempt nonprofit and charitable organizations such as Defendants must submit a Form 990 each year that details the organization's activities, governance structure, and finances.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants are domiciled in Massachusetts and a substantial part of the events giving rise to these claims occurred within this district.

## FACTUAL ALLEGATIONS

### I.    The Community of Jesus

#### a.     Background

17.     The Community of Jesus was founded in the 1960s by Cay Andersen and Judy Sorenson. Over time, the Community has grown from 25 members in the 1970s to more than 200 professed members today. The Community is located in Orleans, Massachusetts, minutes away from Cape Cod Bay's waterfront. It is led by the "Prioress" (formerly Betty Pugsley during the events complained of herein, and now Karen Moore) and current "Subprior" Rick Pugsley (collectively, "Community Leadership" or "Leadership").

18.     From the early days of the Community, it heavily emphasized artistic pursuits and viewed them as an instrument for teaching its values.

19.     To achieve its goals, the Community runs several artistic groups, including Gloriae Dei Cantores choir, Elements Theatre Company, Mount Tabor Ecumenical Centre and Paraclete Press, which publishes and distributes the Community's recorded and printed music.[2]

20.     Community members and their children are asked and often coerced to participate in many different choir and theater performance groups such as Spirit Winter Percussion, a well-known indoor marching percussion ensemble that is also affiliated with AEL.

21.     If Community members resist joining such performance groups, the Community Leadership and members paint them as selfish and as bad Community members. They are told that

---

[2] *Arts*, The Community of Jesus, https://communityofjesus.org/arts/ (last visited July 10, 2025).

they will be sacrificing their natural talents and depriving the world of their gifts. The social pressure to join is so intense that almost all capitulate and agree to participate.

22.     Not only are members forced to participate, they must also support the performance groups financially. For example, for a child to participate in Spirit Winter Percussion, each family must contribute about $7,500 a year. If the parents and child fail to raise this money from fundraising efforts, the parents must make up the difference from their own pockets. The financial strain on Community members is intense.

　　　　　　*i.  AEL*

23.     On information and belief, the Community Leadership created AEL in 1988 to promote its musical and theatrical endeavors throughout the U.S. and around the world and to drive revenue to the Community. AEL hosts performances, art retreats, and children's classes throughout the year including the Outer Cape Winds retreat and Woodland Park Wind Symphony retreat.[3] Some of the groups that perform at the Center come from outside of Massachusetts. AEL charges fees to participate in many of these events. For example, tickets for the Outer Cape Winds retreat cost $1,200 each.

24.     Many of the performances hosted by AEL are for Community-based arts organizations. For example, Gloriae Dei Cantores choir and Elements Theatre Company are both Community groups and are also two of AEL's resident performance ensembles.[4] In fact, one of AEL's former names was Gloriae Dei Cantores Foundation, showing how closely linked this Community group is to AEL.

---

[3] *See generally Upcoming Events*, Arts Empowering Life, https://artsempoweringlife.org/ael-events/ (last visited July 10, 2025).
[4] *About Us*, Arts Empowering Life, https://artsempoweringlife.org/about-arts-empowering-life/ (last visited July 10, 2025).

25.    Through AEL, the Gloriae Dei Cantores Choir and other performance groups grew in popularity and influence, bringing wider attention to the Community. For example, since its founding in 1988, the Gloriae Dei Cantores choir has performed throughout the world in 23 different countries such as Russia, the Netherlands and Finland.[5] Upon information and belief, this has translated into greater profits for both the Community and for AEL.

### ii.  PAB

26.     As AEL grew, both it and the Community Leadership knew that a larger and more modern building was needed to host their growing events. In 2020, AEL formed PAB with the support of the Community's leaders.  Upon information and belief, PAB's entire board of directors comprises Community members.

27.    Similarly, AEL and PAB share common leadership such as Gail Gibson, Lindsey Kanaga, and Daniel Pfeiffer.[6] AEL is the direct controlling entity of PAB.[7]

28.    PAB was created with the express purpose of supporting AEL. PAB describes its mission as:

> "THE FOUNDATION SUPPORTS THE CHARITABLE AND EDUCATIONAL ACTIVITIES AND MISSIONS OF ARTS EMPOWERING LIFE, INC. BY COMMUNICATING WITH DONORS, AND BY DEVELOPING, RENOVATING, CONSTRUCTING, MAINTAINING, AND REPAIRING A PERFORMING ARTS FACILITY AND OTHER RELATED IMPROVEMENTS TO REAL ESTATE IN BREWSTER, MASSACHUSETTS, AND TO RAISE THE FUNDS NECESSARY TO ACCOMPLISH SUCH PURPOSES AND TO UNDERTAKE SUCH OTHER CLOSELY RELATED ACITIVIES [*sic*] AS THE BOARD OF DIRECTORS MAY DETERMINE."[8]

---

[5] *See id*.

[6] Ex. A at 7-8; Ex. B at 7-8. At the time of filing, AEL's Form 990 for the fiscal year ending in June 2024 was made public. However, PAB's most recent public Form 990 was still one covering the fiscal year ending in June 2023. For the sake of consistency, Plaintiff references both Form 990s that cover the fiscal year ending in June 2023.

[7] Ex. A at Schedule R.

[8] Ex. B at 2.

29.    PAB's main project was to help build a new state-of-the-art multi-purpose performing arts center so that AEL and the Community could continue to grow and profit.

30.    To achieve this, Plaintiff and other children from the Community were forced to build the Center.

**b.    Living in the Community**

31.    Despite its emphasis on creative artistic pursuits, the Community Leadership heavily discourages diversity of thought among its own members. Questioning the Community Leadership, however slightly, is viewed as insubordination.

32.    The Community is a "high demand/high control" group that dominates all aspects of its members' lives and thinking.

33.    Community Leadership demands strict obedience to its dictates. Those who deviate can be criticized publicly, fired from their jobs or banished altogether. Members are expected to contribute substantial labor whenever asked. Children are separated from the effective control of their parents. The result is a membership conditioned to obey without question.

34.    This psychological coercion leaves members isolated and completely dependent on the Community.

*i.  The Community's Main Principles*

35.    The Community has core principles that drive its teachings and way of life. These are contained in its text entitled "The Rule of Life of the Community of Jesus." All members, including children, are bound by these principles.

36.    One component of the Community's ideology is absolute obedience to its Leadership without question.

37.    Community doctrine holds that members cannot trust their own thoughts as these are often tainted by ego, intellect or sinful desire. As such, the only way to ensure right behavior is to adhere to all Leadership decisions. Members are taught to distrust themselves and their loved ones and submit fully to higher authority.

*ii.  Light Sessions*

38.    All members are subject to what the Community calls "Light Sessions." Someone who makes a mistake, has been in a bad mood, or is otherwise deviating from expected norms is called out in front of a group of members and questioned about their misbehavior. The public criticism is intended to shame and humiliate the target to the point where they break down and beg for forgiveness.

39.    If the subject resists, the criticisms intensify and sometimes turn physical. Members have had water thrown in their faces, been slapped, or endured other physical abuse. When one Light Session is not enough to "break" the target, it resumes the next day.

40.    These Sessions happen regularly, but few members know in advance when they will be the target. This highly stressful punishment regime seems to come out of nowhere, leaving members in constant fear that they could be next. Ortolani, for example, dreaded Community dinners because Light Sessions would often occur during this time.

*iii.  Hard Times*

41.    When Community members do not improve their behavior after a Light Session, they can be subjected to what the Community calls "Hard Times" – a period of isolation and ostracism.

42.    Those subject to this punishment are often removed from all group activities and sometimes even fired from their jobs at Community-run businesses. Other members are directed

8

not to speak to them, other than to criticize. This directive often extends to one's own family members, who are forbidden to interact. The targets of this comprehensive shunning suffer significant mental anguish.

43.    Those fired from their jobs are still required to make money for their family and the Community, often forcing them to take multiple low-level jobs to survive. The Community views this increased hardship positively because it helps the person submit to the Community's will.

44.    This punishment lasts anywhere from a few days to a few months, during which the targets come under additional surveillance from the Community's Leadership, who monitor their supposed behavioral progress. Only when members have "progressed" to the satisfaction of the Community Leadership does the ostracism relent and they can return to their social circles and support systems.

*iv.  Family Separation*

45.    The Community's members live together in jointly-owned, Community-controlled homes. The Community often requires its members and children to move houses with 24 hours' notice, sometimes without even providing a reason. Despite the fact that many members either fully or partially own their houses in the Community, they can still be ordered to leave and allow another family to replace them.

46.    Children in the Community, including Plaintiff, are regularly ordered to move out of their parents' homes to live with other Community members. These forced separations can begin at the age of four.

47.    The Community believes that parents are unable to properly care for and discipline their children because their judgment is clouded by love. It is supposedly better for the children to live with other Community members who are less affectionate. This practice weakens family

bonds and reinforces dependence on the Community. Children are encouraged to see all Community members as their parents; parents are dependent on the goodwill of other members to provide proper care to their children; and every parent's authority can be overruled by whatever the Community Leadership decides.

   c.   **The education of Community children is woefully inadequate, which reinforces their dependence on the Community.**

48.   Children of Community members, including Plaintiff, are typically sent to the public school system through elementary school. In middle school, they transition to Community-run homeschooling carried out mostly by members without any background in education.

49.   The Community's school system has a small number of children and lacks teachers and resources, so 12-year-olds study in the same class as 17-year-olds. Often the instruction relates to tasks the Community wants the children to do like cooking and construction.

50.   Their highly irregular education reinforces the children's present and future dependence on the Community, since they are poorly equipped for college or other activities outside the Community.

   d.   **The Community exercises economic control and coercion over its members.**

51.   Many Community members work in Community-owned businesses such as Paraclete Press, a publisher of Christian books and music. These jobs typically pay very little. For those who choose not to work in a Community business, the Community Leadership may, at random, order them to quit their jobs and instead work for a chosen Community-owned business that requires extra hands. The Community's interests always supersede any one individual's interests.

52.   This deepens Community members' dependence on the Community by making it difficult for them to build relationships outside the Community and difficult to save enough money

to leave. Most of their earnings must be funneled back to the Community through tithing or other donations to Community events and projects.

53.     The Community deliberately keeps its members busy at all times. Members spend much of their days cleaning or maintaining Community buildings, working in Community-owned businesses, and attending Community choir, music or theater rehearsals. Community members rarely have any free time or space to reflect on the Leadership's all-encompassing authority.

    **e.**    <u>**The Community intentionally restricts access to outside information to maintain its centrality to adherents.**</u>

54.     Children in the Community, like Ortolani, are prohibited from accessing most information technology until around age 14, when they are given access to computers at school. Laptops are permitted at home, but an adult living with the child must give permission and then sit with them during use to prevent access to non-approved material.

55.     Community children are not allowed to have smart phones. At around 15 years old, they are allowed to have flip phones, which cannot access the internet or any social media.

**II.**    <u>**Oliver Ortolani**</u>

    **a.**    <u>**Early Life**</u>

56.     Ortolani was born into the Community and lived there until November 2023, when he was 16 years old. His mother, Ellen, grew up in the Community, and his father, Dave, went to Grenville Christian College, a Canadian boarding school associated with the Community.

57.     Ortolani and his family lived in Orleans, Massachusetts with other Community members during the period covered by this Complaint. Throughout this period, obedience, hard work and complete loyalty to the Community were continuously drilled into him.

58.     When Ortolani was 9 years old, he moved to live with a different family. He spent 18 months with one family before being made to move again. This happened often. Ortolani

estimates that he moved at least 20 times in 16 years. While Ortolani lived with other families, he rarely saw his own parents. He was encouraged not to seek them out or interact with them at all.

59.    Ortolani attended public elementary school and began Community-sponsored homeschooling in sixth grade.

60.    From the age of nine, Ortolani spent the many of his waking hours outside any form of education: mowing lawns, doing landscaping, setting up lighting and scaffolding for Community events and performances, repairing Community houses, and cooking group meals. Childhood play was rare.

**b.    Defendants conspire to initiate the child forced labor scheme to reduce the costs of constructing the Center.**

61.    As Defendants prepared to build their new Center in Brewster, Massachusetts starting in late 2018, its cost worried them. Its land had been donated, but the project was very complex — they still needed to finance the construction, hire contractors from both in and out of state, all of which was estimated to cost millions of dollars. Defendants took out a multi-million dollar loan, but also decided to save money by making Community boys do much of the work.

62.    It benefitted each Defendant to partake in this scheme because they all had financial interests in building the Center quickly and cheaply.

63.    Upon information and belief, AEL and PAB were responsible for obtaining the land and loan for the building and overseeing much of the project. Many of AEL and PAB's employees who oversaw the project were also Community members. The Community Leadership was largely responsible for providing the person-power for the project because it knew that it could compel its children to work for free.

**c.    Plaintiff is forced to perform unpaid and illegal labor for Defendants starting at age 11.**

64.    In 2019, when Plaintiff was 11 years old, the Community Leadership, AEL and PAB launched their forced labor scheme under the false premise of a volunteer "summer work program." All of the boys from the Community, aged nine to 16, were made to participate in renovating and repairing AEL's storage and practice facilities, among other projects. The Community often used these spaces for its own performances.

65.    This summer program embodied the Community Leadership's method of asserting control over its members. It claimed it created the project because some of the older boys had been caught drinking alcohol and misbehaving. Under the guise of rehabilitating them, the Community Leadership required all able-bodied boys to do grueling manual labor that otherwise would have required paid construction workers.  Ortolani, who currently works in construction, estimates that his and the other boys' labor saved Defendants at least half a million dollars in labor costs in the Center's construction.

66.    Using the children's labor also sped up the project because for this entirely captive population, Defendants did not have to respect legal requirements for working hours or break times.

67.    The summer program was so successful that the Community Leadership extended it, first into fall 2019 and then into 2020.

68.    The boys' parents had to sign a waiver with PAB to participate, which stated:

> I want my child to participate in the construction of the new performing arts facility for the Foundation ("Activities") at the construction site at 36 Southern Eagle Cartway, Brewster, MA ("Site"). I understand the construction will involve power tools, ladders, hydraulic equipment, earth moving equipment, cranes and other construction materials, and other danger… I understand that this is on a volunteer basis and that there will be no payment for services...

69.     Neither Plaintiff nor his parents knew that this project would take over the children's lives, nor that the boys would not receive any real schooling.

**d.     Ortolani is subjected to regular abuse while building the Center.**

70.     The Center worksite was located in a remote, wooded area, far away from where Ortolani and the other boys lived.  They had to be driven to and from the worksite every day. The adults in the Community used phones and emails to coordinate this transportation.

71.     The site was ringed by barbed wire except at the entrance gate, which was always locked. Once the boys entered, the gate was locked behind them. They could not leave until the end of the day, when an adult opened the gate with a code.

72.     During their forced labor, Plaintiff and the other boys were awakened daily between 4:30 and 5:00 a.m. Some days, they were made to do two and a half hours of exercise first thing in the morning – other times, they were brought straight to the worksite to begin laboring. They were allowed only 10 minutes to eat breakfast before being driven to the worksite.

73.     Upon arrival, the adults from the Community would conduct a Light Session during which at least one child would be asked what they were "double-minded" about. Sometimes an adult would bring up a work mistake the child had made the previous day, other times the child would be asked to confess an "impure" thought. Then he would be shouted at, shamed, and told his "spirit was off." This lasted until he confessed to something and asked for forgiveness. These sessions often happened at random during the workday as well.

74.     Once the morning Light Session was over, the children were told to get to work. Their tasks included digging the building's foundation using shovels, carrying 90-pound bags of concrete, laying rebar, and framing the building's walls, among others. The boys often worked six days a week.  They worked nine to 16 hours a day with few breaks. They were often forced to

work into the night, even during Massachusetts' cold winter months, with illumination provided by large lights brought in by Defendants.

75.    The boys were not provided with morning or afternoon breaks, which are customary on construction sites. Although he was allowed a 20-minute lunch break, Plaintiff went hungry most days because he was not given enough time to eat his lunch or other snacks during these long shifts.

76.    The boys were allowed to leave the site only when the adults unlocked the gate in the evenings, sometimes as late as 10 p.m. Ortolani would often be too tired from the manual labor to eat dinner at night. He craved sleep and tried to get as much as he could before he was awakened early the next morning to start another grueling day. Defendants' intense work demands meant he rarely received enough sleep for a growing boy.

**e.    Ortolani is subjected to regular physical punishments.**

77.    Plaintiff and the other boys were required to be completely obedient to the Community members running the worksite. If a boy was thought to have a bad attitude, made a mistake or talked back to an adult, all the boys would be punished.

78.    Punishment took many forms, including: being forced to run for hours or do hundreds of push-ups; having to dig through layers of hardened clay for hours; and having to perform high-knees holding their hands above their heads or while pushing heavy wheelbarrows.

79.    Ortolani was once made to run laps in steel-toed boots on a hot July day for 4 hours as punishment because an adult on the worksite had left a hatchet out and one of the boys' overseers thought that it was their mistake.

80.    While working on the site, as within the Community generally, talking back to superiors was not tolerated. Nobody wanted to risk triggering yet another severe punishment, so

supervisors were rarely approached even with benign suggestions or comments. In this authoritarian environment, serious problems and safety issues were also left unspoken.

     *i.    Ortolani's brother is physically assaulted on the worksite.*

81.    One day, Ortolani's 13-year-old brother Noah was physically and mentally exhausted by the onslaught of work. After a Community member told him that he was being disrespectful, Noah responded with "I don't think I was being disrespectful, but I guess I was." Noah's comment enraged the Community member who then took Noah's hat, threw it on the ground, and started beating him up.

82.    No adults intervened. After the fight, the other young boys were given special treats like the beverage Propel and were taken swimming, seemingly to persuade them to forget about the incident and not share its details.

83.    Noah was then removed from the worksite and put on Hard Times. He remained in near-total isolation from the Community for six months. Community members were told not to talk to him, and he was unable to participate in school or other normal activities. Instead, he spent his days sitting in his father's truck while his father worked.

84.    Noah's fate loomed large for Ortolani. He was terrified that Community members on the worksite might physically harm him or remove him from everything he knew too. He knew he could not escape or resist the forced labor operation without experiencing the same serious harm as Noah. Keeping his head down and doing what he was told was the safest course of action. Despite his deteriorating physical and mental health, he continued work on Defendants' Center.

    **f.**    **A number of the boys are either injured or experience near misses on the worksite.**

85.    Ortolani and the other boys were not properly trained or equipped to be workers on an active construction site, even if they had not been children who should never have been there.

Like any construction site, the Center was full of hazards. It was also poorly supervised and staffed, largely by inexperienced adults and children who often were put in harm's way.

86.     Concrete dust is a health hazard that can cause lung cancer and chronic obstructive pulmonary disease, among other diseases and infections. The Centers for Disease Control and Prevention recommends that construction workers wear respirators around concrete dust because of the serious damage that it can cause to their lungs.[9]

87.     But Defendants regularly exposed Ortolani and the other boys to concrete dust and only gave them one single-use, disposable mask to use over a three-month period. They were told it was their responsibility to keep it stored in a bag while they were not on the site so that it remained usable, despite its self-evident inadequacy compared to a respirator.

88.     Defendants similarly neglected to ensure that the boys were properly dressed for the work. Ortolani was often cold and wet on the job site.

89.     The general shoddy approach to safety led to various accidents and near-misses.

90.     In one incident, an adult on site misfired a nail gun. The released nail ricocheted off one of the nearby chipboards and hit Plaintiff's teenage brother, Jake, squarely in the forehead of his hardhat.

91.     Another time, one of the tools used to cut rebar was misused and a piece of it hit a young boy in the eye. He required immediate medical attention.

92.     On yet another occasion, an adult was using a lull forklift to bring down a crate of scrap material from the roof. The crate was knocked over and nearly hit some of the children working below as it crashed to the ground.

---

[9] Alan Echt et al., *A Guide to Respirators Used for Dust in Construction*, Centers for Disease Control and Prevention (Aug. 17, 2020), https://blogs.cdc.gov/niosh-science-blog/2020/08/17/respirators-construction/. https://blogs.cdc.gov/niosh-science-blog/2020/08/17/respirators-construction/.

**g.    Defendants attempt to pass off the children's forced labor as education.**

93.    The boys' parents were under the impression that although they would be helping on the construction site, they would still be receiving an education. These classes never materialized. Instead, Defendants attempted to frame the forced labor itself as schooling.

94.    Defendants invented fake course descriptions that repackaged the construction jobs in educational terms, and would occasionally bring a teacher onto the worksite for a lesson in a meager effort to claim that their child laborers were getting a good education.

95.    Ortolani spent almost no time in any educational activity during his time building the Center. This cost him the better part of two years of schooling.

**h.    Defendants report the children's hours of forced labor as volunteer hours for financial gain.**

96.    Upon information and belief, in addition to framing the children's forced labor as an education, the Community Leadership reported the hours worked by the children on the construction site as volunteer hours. They provided this information to their bank, which had agreed to match those hours with direct financial contributions.

97.    Thus, Defendants doubly profited from their forced labor scheme. They saved money by not paying the boys for their work, and they also generated additional money by fraudulently reporting the boys' hours to the bank in exchange for payments.

**i.    Defendants knew their conduct was wrongful.**

98.    Like any commercial construction job, the Center's site was subject to regular government inspections, for example for renewing its elevator permit.

99.    On such occasions the adults on the site would hide Plaintiff and the other boys away or remove them entirely so that the inspectors would not see a worksite full of children.

18

**j.    The illegal work and abusive environment takes a toll on Ortolani and the other boys.**

100.    After many months of grueling manual labor, Ortolani suffered from constant joint and back pain as a result. His mental health was also suffering. He was feeling increasingly hopeless, depressed and anxious. He recalls feeling like he became a different person while working to construct the Center.  The other boys had similar experiences.

101.    As the project went on, the Community Leadership began to worry about its potential legal liability for keeping the boys out of school for so long. Defendants began to consider whether to remove the boys from the worksite.

102.    One day, while Ortolani and the boys were working on the site, one boy accidentally broke a chair. The Community member supervisors became very angry. But this gave the Community Leadership and other Defendants an opening to remove the boys from the project. They were ordered to leave the site and not to return.

103.    Though the hard physical work stopped, Ortolani's joint and back pain did not. He has had to visit multiple doctors for diagnosis and treatment.

104.    The time the boys spent on the worksite and the abuse they experienced there has had a profound effect on their mental health. One of the boys committed suicide after the project ended.

105.    Plaintiff's mental health has also suffered as a result of the near daily psychological coercion to which he was subjected. He was prescribed antidepressants for several months and treated by a therapist to cope with the trauma he endured. He was diagnosed with post-traumatic stress disorder ("PTSD").

### k.    The building is completed and heralded as a "beacon of possibility."

106.    The Center was finished in October 2021. *Cape Cod Life*, a lifestyle magazine, described it as a "beacon of possibility." The building's "stunning architecture and creative atmosphere surrounds both the young and the established artist with beauty and design, inspiring all who walk through its doors to create with a greater purpose."[10]

107.    The building has enabled AEL, and therefore the Community, to expand its programming. In addition to offering year-round concerts and performances by resident AEL ensembles, the Center offers:

- Concerts by Guest Artists & Ensembles

- Arts Speak: Engaging Arts & Entertainment Lectures

- Artist Retreats and Residency Programs

- Masterclasses and Workshops

- Youth Outreach: Workshops, summer camps, and the Young Performers Outreach Program[11]

108.    All of these events further enrich Defendants through ticket sales and positive media. People remain unaware that this "beacon of possibility" was created on the backs of children who were denied schooling and forced to work grueling days to enrich their traffickers.

### PLAINTIFF'S DAMAGES

109.    In addition to the damages mentioned above, as a direct and proximate cause of Defendants' conduct, Plaintiff suffered, continues to suffer and will suffer in the future, psychological injuries, including but not limited to, anxiety, panic attacks, PTSD, stress, distrust

---

[10] *Supra*, fn. 4.
[11] *Id.*

of authority, shame, and fear, as well as physical injuries. All of these injuries cause and will cause Plaintiff's noneconomic damages.

110.    Plaintiff also suffered and continues to suffer economic damages, including but not limited to, unpaid wages, at least a two-year delay in his education, and the cost of mental health treatment.

111.    Defendants acted with an outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety and welfare of others, including Plaintiff. Therefore, Plaintiff is entitled to punitive damages against Defendant.

## CAUSES OF ACTION

### COUNT I

**Violations of TVPRA 18 U.S.C. §§ 1589 and 1595 – Forced Labor – Direct Liability**
***Plaintiff against All Defendants***

112.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

113.    Defendants COJ, AEL and PAB violated 18 U.S.C. §§ 1589 and 1595 by knowingly providing and/or obtaining the labor of Ortolani through force, threats of force, physical restraint and/or threats of physical restraint; serious harm and/or threats of serious harm; and through a scheme, plan or pattern to make Ortolani believe he would suffer serious harm if he did not perform this labor. Defendants did this by, *inter alia*:

    a)   Abusing Ortolani;

    b)   Overworking Ortolani;

    c)   Limiting Ortolani's access to information;

    d)   Subjecting Ortolani to a restrictive code of conduct;

    e)   Depriving Ortolani of sleep;

f)   Instilling fear of castigation, disobedience and leaving, through Light Sessions, Hard Times, and other means; and

g)   Humiliating Ortolani for any perceived disobedience or mistakes.

114.   Ortolani labored for no pay under inhumane conditions because Defendants used psychological violence, physical restraint, social isolation, humiliation, coercion and indoctrination to cause Ortolani to believe that he could not refuse to work or leave the project site without facing serious harm.

115.   Defendants exploited Ortolani as a vulnerable child who spent much of his childhood isolated from family.

116.   Ortolani suffered damages as a result of the conduct of Defendants COJ, AEL and PAB.

117.   Ortolani is entitled to compensatory and punitive damages and restitution in amounts to be determined at trial together with reasonable attorney's fees and the costs of this action, and any other relief deemed appropriate.

## **COUNT II**

**Violations of TVRPA 18 U.S.C. §§ 1589 and 1595 – Forced Labor – Beneficiary Liability**
***Plaintiff against All Defendants***

118.   Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

119.   Defendants knowingly financially benefitted from participating in a venture which they knew or should have known engaged in forced labor in violation of the TVPRA. 18 U.S.C. § 1589.

120.   Defendants financially benefited, *inter alia*, because by using unpaid labor to help build the Center, they saved money they would have spent paying fair wages and taxes. As a result

of the forced labor, Defendants also benefited from getting a magnificent space to put on the Community's art performances, from being able to sell tickets to performances, retreats and classes by the Community and others, and because they obtained matching donations for Ortolani and the other boys' supposed "volunteer hours."

121.    Defendants knew or should have known that the venture they participated in engaged in providing and/or obtaining forced labor.

122.    Ortolani suffered damages as a result of Defendants' conduct.

123.    Ortolani is entitled to compensatory and punitive damages, and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action and any other relief deemed appropriate.

## COUNT III

### Violation of TVPRA 18 U.S.C. §§ 1590 and 1595 – Trafficking with Respect to Forced Labor – Direct Liability

124.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

125.    Defendants knowingly recruited, harbored, provided, obtained and/or transported Ortolani for forced labor in violation of 18 U.S.C. § 1590(a).

126.    Ortolani suffered damages as a result of Defendants' conduct.

127.    Ortolani is entitled to compensatory and punitive damages, and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action and any other relief deemed appropriate.

## COUNT IV

**Violation of TVPRA 18 U.S.C. §§ 1590 and 1595 – Trafficking with Respect to Forced Labor – Beneficiary Liability**
***Plaintiff against All Defendants***

128.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

129.    Defendants knowingly recruited, harbored, provided, obtained and/or transported Ortolani for forced labor in violation of 18 U.S.C. § 1590(a).

130.    Defendants financially benefited, *inter alia*, because by using unpaid labor to help build their Center, they saved money they would have spent paying fair wages and taxes. As a result of the forced labor, Defendants also benefited from getting a magnificent space to put on the Community's art performances, from being able to sell tickets to performances, retreats and classes by the Community and others, and because they obtained matching donations for Ortolani and the other boys' supposed "volunteer hours."

131.    Defendants knew or should have known that the venture they participated in engaged in providing and/or obtaining forced labor.

132.    Ortolani suffered damages as a result of Defendants' conduct.

133.    Ortolani is entitled to compensatory and punitive damages, and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action and any other relief deemed appropriate.

## COUNT V

**Violation of TVPRA 18 U.S.C. §§ 1589, 1590, 1594(a) and 1595 – Attempted Forced Labor and Trafficking**
***Plaintiff against All Defendants***

134.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

135.    While, as alleged above, Defendants violated 18 U.S.C. §§ 1589 and 1590, in the alternative, they are liable because they attempted to violate 18 U.S.C. §§ 1589 and 1590. 18 U.S.C. §§ 1594(a) and 1595.

136.    Defendants intended to violate and took the necessary steps to commit the offenses outlined in 18 U.S.C. §§ 1589 and 1590 or to benefit therefrom.

137.    Ortolani suffered damages as a result of the conduct of Defendants.

138.    Ortolani is entitled to compensatory and punitive damages, and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action and any other relief deemed appropriate.

## **COUNT VI**

**Violation of TVPRA 18 U.S.C. §§ 1589, 1590, 1592, 1594 and 1595 – Conspiracy to Recruit, Obtain, Provide, Transport and Harbor With Respect to Forced Labor**
***Plaintiff against All Defendants***

139.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

140.    It is a violation of the TVPRA to "conspire[] with another" to violate sections 18 U.S.C. §§ 1589, 1590, 1592 of the TVPRA. 18 U.S.C. §§ 1594(b).

141.    Defendants conspired by agreeing to recruit, harbor, and/or transport Plaintiff to the worksite and to provide and/or obtain his forced labor through force, threats of force, physical restraint and/or threats of physical restraint; serious harm and/or through threats of serious harm; and/or through a scheme, plan, or pattern to make Plaintiff believe he would suffer serious harm if he did not perform their labor.

142.    Defendants entered into this joint enterprise and were aware of its general nature and extent.

143.    Defendants worked together to ensure that the joint enterprise worked toward their knowing financial benefit.

144.    Defendants conspired to benefit from Plaintiff's forced labor by ensuring he was not appropriately paid for his work.

145.    Plaintiff suffered damages as a result of Defendants' conduct.

146.    Plaintiff is entitled to compensatory and punitive damages, and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action and any other relief deemed appropriate.

## COUNT VII

### Violation of Mass. Gen. Laws c. 265, § 51 (2023) – Forced Services and Trafficking
### *Plaintiff against All Defendants*

147.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

148.    Defendants subjected Plaintiff to forced services by causing him or exposing him to serious physical and psychological harm or threats to cause serious physical, financial, and reputational harm, in violation of M.G.L. c. 265, § 51 (2023).

149.    Plaintiff is entitled to monetary relief in the form of compensatory and punitive damages and interest in an amount to be determined at trial, and reasonable attorney's fees, pursuant to M.G.L. c. 260, § 4D (2023).

## COUNT VIII

### Violation of Federal Racketeer Influenced and Corrupt Actions Act 18 U.S.C. §§ 1961-68
*Plaintiff against All Defendants*

150.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

151.    Defendants are associated in fact and are an "enterprise" as defined by 18 U.S.C. § 1961(4). Defendants are associated in fact because of their shared performing groups, common leadership, and joint efforts to fund and build the Center.

152.    At all relevant times described in this Complaint, Defendants have been engaged in an ongoing association, coordinated by Defendant COJ, for the purpose of carrying out the forced child labor at the center of Ortolani's claims.

153.    Defendants have engaged in the pattern and practice of forced labor and human trafficking in violation of 18 U.S.C. §§ 1589, 1590(a), 1594(a) and 1595.

154.    The repeated predicate acts of forced labor and human trafficking constitute a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

155.    This series of predicate acts extended over a substantial period of time, during some of the most formative years of Ortolani's adolescence.

156.    Though the construction of the Center is now complete, it is possible that Defendants plan to continue their scheme indefinitely for other construction or maintenance projects.

157.    Ortolani is a "person" with standing to sue under RICO as defined by 18 U.S.C. § 1964(c) because Defendants subjected him to forced labor and human trafficking, causing him physical, psychological, and economic injury.

158.    Defendants engaged in interstate commerce during their forced labor and trafficking scheme as 1) they used phones and emails to coordinate the children's labor on the worksite, 2)

the construction of the Center involved several companies from outside the state of Massachusetts, and 3) the Center hosts performances from groups coming from outside the state of Massachusetts.

159.    Ortolani was damaged as a result of Defendants' conduct.

160.    Ortolani is entitled to treble damages in addition to the cost of this suit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## COUNT IX

### Unjust Enrichment
### *Plaintiff against All Defendants*

161.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

162.    There is no contract between Ortolani and Defendants that covers the subject matter of this dispute.

163.    Throughout 2019 and 2020, Ortolani conferred a benefit on Defendants by performing unpaid labor for Defendants as described in this Complaint.

164.    Defendants were enriched by Ortolani providing Defendant with his unpaid labor.

165.    As shown in the Complaint, Ortolani believed he was being signed up for a volunteer program. Had he known the extent of the labor he would be required to perform, he reasonably would have expected compensation from Defendants for the benefit he provided to them.

166.    Defendants were aware of the benefit conferred upon them by Ortolani and of his reasonable expectations for compensation arising from the labor he was required to perform.

167.    Defendants retained that benefit without compensating Ortolani for the benefit he conferred on Defendants.

168.    Defendants' retention of the benefits Ortolani conferred on them without compensating Ortolani is inequitable and unjust.

28

169.    The reasonable value of the benefit conferred on Defendants is $100,000.

170.    For all reasons stated above, it is against equity and good conscience to permit Defendants to retain the benefit that Ortolani provided to them without compensating Ortolani for its value.

## DEMAND FOR JURY TRIAL

171.    Plaintiff respectfully hereby demands a trial by jury as to all matters so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a.    Award monetary relief in the form of compensatory and punitive damages and interest due to being subjected to forced labor, pursuant to 18 U.S.C. § 1595(a), in an amount to be determined at trial;

b.    Award monetary relief in the form of compensatory and punitive damages and interest due to being subjected to forced services, pursuant to M.G.L. c. 265, § 51 (2023); c. 260 § 4D, in an amount to be determined at trial;

c.    Award attorney's fees, costs and expenses authorized by 18 U.S.C. § 1595(a);

d.    Order disgorgement of profit that accrued to Defendants from Plaintiff's labor;

e.    Award such other and further relief as the Court may deem just and proper.

Dated: July 16, 2025                                        Respectfully submitted,

BY: _/s/ Carol Merchasin_____
Carol Merchasin (BBO# 556752)
Lillian Smith (*pro hac vice* forthcoming)
**MCALLISTER OLIVARIUS**

641 Lexington Avenue, 13th Floor
New York, New York 10022
(212) 433-3456
cmerchasin@mcolaw.com
lsmith@mcolaw.com
*Attorneys for Plaintiff*