UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| OLIVER ORTOLANI, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 25-12005-LTS |
| COMMUNITY OF JESUS, INC., et al., | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON MOTIONS TO DISMISS (DOC. NOS. 13, 14, 15)

June 26, 2026

SOROKIN, J.

Oliver Ortolani brings this suit against the Community of Jesus, Inc. ("Community"),

Arts Empowering Life, Inc. ("AEL"), and Performing Arts Building Foundation, Inc. ("PABF"),

advancing claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and

state laws.  Ortolani's claims arise out of his allegation that Defendants engaged in an illegal

scheme to build a performing arts center using unpaid child labor.  Each defendant has moved to

dismiss.  Doc. Nos. 13-15.[1]  For the reasons that follow, the motions to dismiss are DENIED.

I.   BACKGROUND

A.   The Community of Jesus

The following facts are drawn from the complaint and documents incorporated therein.

The Court notes based on its review of the motion papers as well as the pleadings in a related

case (Cmty. of Jesus, Inc. v. Ortolani, 25-cv-13453-LTS (D. Mass. May 4, 2026)) that

---

[1] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

Defendants dispute many of the allegations described below.  Nonetheless, for the purpose of resolving the motions to dismiss in this matter, the law directs the Court to accept the complaint's factual allegations as true.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The Community is a religious organization located in Orleans, Massachusetts.  Doc. No. 1 ¶ 17.  Originally founded in the 1960s, the Community boasts more than 200 members today.  Id.  The organization has two leaders who hold the titles of "Prioress" and "Subprior" (collectively, "Community Leadership").  Id.

According to the complaint, the Community is a "high demand/high control" group that requires its members to strictly obey its dictates.  Id. ¶¶ 32-33.  The Community's core doctrines and principles are outlined in a text entitled, "The Rule of Life of the Community of Jesus," which all members of the Community must follow.  Id. ¶ 35.  One component of the Community's ideology is absolute obedience to the Community Leadership.  Id. ¶ 36.  The Community teaches its members that they cannot trust their own thoughts and must instead fully submit to the decisions of the Community Leadership.  Id. ¶ 37.

To ensure adherence to its rules, the Community engages in various practices and control tactics.  One such practice is called a "Light Session."  Id. ¶ 38.  During a Light Session, a Community member who has made a mistake, been in a bad mood, or otherwise deviated from expected norms is called out and questioned about their behavior in public.  Id.  If the subject resists the public criticism, the criticism intensifies and sometimes turns physical.  Id. ¶ 39.  Community members rarely know in advance when they will be the target of a Light Session, leaving all members in constant fear of being next.  Id. ¶ 40.

When Community members do not improve their behavior after a Light Session, they may be placed into "Hard Times," a period of intense isolation and ostracism.  Id. ¶ 41. Members undergoing Hard Times are removed from group activities and sometimes fired from their jobs at Community-run businesses.  Id. ¶ 42.  Other Community members are directed not to speak to these isolated members, other than to criticize them.  Id.  Hard Times can last anywhere from a few days to a few months.  Id. ¶ 44.  During this period, the Community Leadership monitors the isolated member and determines when they can return to their social circles.  Id.

Another way in which the Community asserts control over its members is family separation.  Community members live together in jointly owned homes controlled by the Community.  Id. ¶ 45.  Even though many members own their homes, the Community can order them to leave and switch homes with little notice.  Id.  The Community also regularly directs children to move out of their parents' homes to live with other Community members, encouraging them to view all Community adults as their parents.  Id. ¶¶ 46-47.  This practice weakens family ties and reinforces members' dependence on the Community.  Id. ¶ 47. Moreover, children in the Community are prohibited from accessing the internet until they turn fourteen and are never allowed to use computers without adult permission.  Id. ¶ 54.  While children are allowed to have flip phones once they turn fifteen, they are prohibited from owning smart phones.  Id. ¶ 55.

The Community also exercises control over the professional lives of its members.  Many Community members work in Community-owned businesses that offer little pay.  Id. ¶ 51.  For those who hold jobs outside the Community, the Community Leadership retains the authority to order them to quit their jobs and work for a Community-owned business instead.  Id.

3

Additionally, members are required to donate most of their earnings back to the Community.  Id. ¶ 52.

Finally, the Community uses artistic pursuits to teach its values and spread its doctrine. Id. ¶ 18.  The Community runs several artistic groups, including a choir and a theater company, and pressures members to join these groups.  Id. ¶¶ 19-21.  Not only are members forced to participate, but they are also required to support the groups financially.  Id. ¶ 22.  In 1988, the Community Leadership launched another entity, AEL, to promote its musical and theatrical endeavors throughout the world and to drive revenue to the Community.  Id. ¶ 23.  AEL organizes and hosts artistic performances, many of which are for Community-based arts organizations.  Id. ¶¶ 23-24.  AEL also coordinates other events, such as art retreats and children's classes, throughout the year.  Id. ¶ 23.

Ortolani was born into the Community and lived there until November 2023, when he was sixteen years old.  Id. ¶ 56.  When he was nine, he moved to live with a different family within the Community, and he was made to move again eighteen months later to live with yet another family.  Id. ¶ 58.  Over the course of his sixteen years in the Community, Ortolani moved homes at least twenty times.  Id.  His claims in this case arise from his experiences working on the construction site of Defendants' performing arts center.  The Court turns to those allegations.

    B.    <u>Construction of the Center</u>

In the summer of 2019, when Ortolani was eleven years old, AEL and the Community launched a "summer work program," which required all Community boys aged nine to sixteen to participate in renovating and repairing AEL's storage and practice facilities.[2]  Id. ¶ 64.  The

---

[2] Ortolani alleges that "the Community Leadership, AEL <u>and PAB[F]</u> launched" the summer work program "[i]n 2019."  Id. ¶ 64 (emphasis added).  However, elsewhere, the complaint states that PABF was formed in 2020.  Id. ¶ 26.  The 2020 date is supported by the publicly available "Business Entity Summary" for PABF published on the Secretary of Massachusetts's website,

Community Leadership claimed that the program was intended to rehabilitate the boys of the Community, some of whom had been caught drinking alcohol or misbehaving. Id. ¶ 65. But as alleged in the complaint, the Community and AEL's true purpose behind creating the work program was to staff their construction needs without paying for professional contractors or abiding by legal requirements for working hours and break times. Id. ¶¶ 64-66.

Based on the success of the program, the Community and AEL extended it into 2020. Id. ¶ 67. At that point, AEL and the Community Leadership had devised a plan to build a new performing arts center ("Center") to host AEL's growing artistic events. Id. ¶¶ 26, 61. To support this project, AEL formed PABF, an organization created with the express purpose of supporting "the charitable and educational activities and missions of" AEL "by developing, renovating, constructing, maintaining, and repairing a performing arts facility." Id. ¶ 28. As the Community and AEL had done before with other construction projects, Defendants recruited boys from the Community to bear the brunt of the labor of building the Center. Id. ¶¶ 64-68. PABF required parents of the boys to sign a waiver to participate, which stated:

> I want my child to participate in the construction of the new performing arts facility for the Foundation ("Activities") at the construction site at 36 Southern Eagle Cartway, Brewster, MA ("Site"). I understand the construction will involve power tools, ladders, hydraulic equipment, earth moving equipment, cranes and other construction materials, and other danger. . . . I understand that this is on a volunteer basis and that there will be no payment for services.

Id. ¶ 68. Ortolani's father signed this agreement on October 4, 2020. Doc. No. 17-4 at 2-3. However, neither Ortolani nor his parents understood the true nature of the work program. Doc. No. 1 ¶ 69. For example, Defendants portrayed the work program as an educational opportunity,

which indicates that PABF was organized in May 2020. See 17-1 at 6. The Court takes judicial notice of this document. Given this contradictory detail, the Court declines to credit Ortolani's allegation that PABF played a role in launching the summer work program in 2019. Henning v. Wachovia Mortg., FSB, 969 F. Supp. 2d 135, 147 (D. Mass. 2013) (noting that when a public document "contradict allegations in the complaint, the documents trump the allegations").

5

inventing fake course descriptions that packaged the construction work in educational terms.  Id. ¶ 94.  In reality, the program rarely provided any formal schooling or educational programming. Id. ¶ 95.

Instead, the work program subjected the boys to long hours, strenuous working conditions, and harsh disciplinary methods.  The Center worksite was located in a remote, wooded area, far from where Ortolani and the other boys lived.  Id. ¶ 70.  The boys were awakened daily between 4:30 and 5:00 a.m. to begin their workday.  Id. ¶ 72.  The worksite was enclosed in barbed wire except at the entrance gate, which was always locked.  Id. ¶ 71.  The boys were not allowed to leave until the end of the day, when an adult opened the gate with a code.  Id.  Upon arriving at the worksite, adults from the Community would conduct a Light Session, during which at least one child would be shamed or criticized.  Id. ¶ 73.  These sessions also occurred at random moments during the workday.  Id.

Once the morning Light Session was over, the boys began their labor.  Id. ¶ 74.  Their tasks included digging the building's foundation using shovels, carrying ninety-pound bags of concrete, laying rebar, and framing the building's walls.  Id.  They worked nine to sixteen hours a day and often six days a week.  Id.  The boys were not provided with morning or afternoon breaks, which are customary on construction sites, and they were only allotted a twenty-minute lunch break.  Id. ¶ 75.  Ortolani often went hungry because he was not given enough time to eat lunch or other snacks during his long shifts.  Id.  Furthermore, the boys were often forced to work into the night, even during the cold winter months, with illumination provided by large lights brought in by Defendants.  Id. ¶ 74.  They could leave the site only when the adults unlocked the gate in the evenings, sometimes as late as 10:00 p.m.  Id. ¶ 76.  Because of the late nights and early mornings, Ortolani rarely got enough sleep.  Id.

The boys were required to be completely obedient to the Community adults running the worksite.  Id. ¶ 77.  If one of the boys made a mistake or spoke back to an adult, all the boys were punished.  Id.  Punishment took various forms, including being ordered to run for hours, do hundreds of push-ups, dig through layers of hardened clay, perform high-knees, and push heavy wheelbarrows.  Id. ¶ 78. Ortolani was once ordered to run laps in steel-toed boots on a hot summer day for four hours as punishment for a misplaced hatchet.  Id. ¶ 79.

Punishment was not limited to physical drills.  One day, Ortolani's thirteen-year-old brother, Noah, was feeling physically and mentally exhausted from the work.  Id. ¶ 81.  After a Community member told him that he was being disrespectful, Noah responded, "I don't think I was being disrespectful, but I guess I was."  Id.  The Community member grew enraged and began beating Noah.  Id.  No adults intervened.  Id. ¶ 82.  Noah was then removed from the work program and placed on Hard Times.  Id. ¶ 83.  He remained in near-total isolation from the Community for six months.  Id.  Community members were instructed not to talk to him, and he was barred from participating in school or other normal activities.  Id.

After witnessing Noah experience abuse and isolation from the Community, Ortolani grew fearful that resisting the work program in any manner would lead him to experience the same harm.  Id. ¶ 84.  As a result, Ortolani kept his head down and continued working despite the harmful conditions of the worksite.  Id. ¶¶ 84-85.  The worksite exposed the boys to concrete dust—a health hazard that can cause lung cancer and chronic obstructive pulmonary disease.  Id. ¶ 86.  Instead of providing the boys with respirators as recommended by the Centers for Disease Control and Prevention, Defendants gave each boy one single-use, disposable mask to reuse again and again over a three-month period.  Id. ¶¶ 86-87.  Defendants similarly neglected to ensure that the boys were properly dressed for work; consequently, Ortolani was often cold and

7

wet at the job site.  Id. ¶ 88.  Furthermore, the boys were never properly trained to work on an

active construction site and were supervised by inexperienced adults.  Id. ¶ 85.  This led to

various accidents and near-misses that put the boys' safety at risk.  Id. ¶¶ 89-92.

Defendants reaped financial benefits from the work program.  Id. ¶ 96.  Not only did they

save costs by obtaining free labor for the construction project, they also generated additional

revenue by reporting the boys' work hours as volunteer hours.  Id. ¶¶ 96-97.  When the

Community Leadership reported these hours to its bank, the bank agreed to match the hours with

direct financial contributions.  Id.  All the while, Defendants concealed the nature of their

worksite from outsiders.  Like any commercial construction job, the Center's site was subject to

regular government inspections.  Id. ¶ 98.  During these occasions, adults on the site would hide

Ortolani and the other boys from the inspectors.  Id. ¶ 99.

Meanwhile, the stresses of the work program took a toll on Ortolani.  Throughout the

months he worked at the job site, Ortolani suffered from constant joint and back pain.  Id. ¶ 100.

He also felt increasingly hopeless, depressed, and anxious.  Id.  Even after the Community

Leadership ended the work program in 2020,[3] Ortolani continued to experience physical and

mental symptoms and was eventually diagnosed with post-traumatic stress disorder ("PTSD").

Id. ¶¶ 100, 105.  The other boys similarly suffered profound mental-health consequences from

---

[3] The complaint alleges that the Community Leadership ended the work program out of concern that keeping the boys out of school would expose Defendants to potential legal liability.  Doc. No. 1 ¶¶ 101-102.  However, the complaint does not allege when this occurred.  Elsewhere, the complaint alleges that the work program began in the summer of 2019 and "extended . . . first into fall 2019 and then into 2020."  Id. ¶ 67.  The complaint also notes that Ortolani "performed unpaid labor for Defendants" "[t]hroughout 2019 and 2020."  Id. ¶ 163.  Based on these allegations, the Court draws the reasonable inference that the work program ended at some point in 2020.

their experiences at the worksite.  Id. ¶ 104.  Tragically, one of the boys committed suicide after the work program ended.  Id.

The Center was completed in October 2021.  Id. ¶ 106.  Described as a "beacon of possibility" by Cape Cod Life, a local lifestyle magazine, the Center has enabled Defendants to expand their artistic programming and community outreach.  Id. ¶¶ 106-107.  The Center offers a variety of events, including concerts, lectures, artist residency programs, workshops, and youth arts programs.  Id.  All of these events have enriched Defendants through ticket sales and positive media coverage.  Id. ¶ 108.

C.    Procedural History

Ortolani filed this suit on July 16, 2025.  Doc. No. 1.  He currently advances eight counts, each of which he brings against all three Defendants: Count I alleges forced labor (direct liability) in violation of the TVPRA; Count II alleges forced labor (beneficiary liability) in violation of the TVPRA; Count III alleges trafficking (direct liability) in violation of the TVPRA; Count IV alleges trafficking (beneficiary liability) in violation of the TVPRA; Count V alleges attempted forced labor and trafficking in violation of the TVPRA; Count VI alleges conspiracy in violation of the TVPRA; Count VII alleges forced services and trafficking in violation of state law (Mass. Gen. Laws ch. 265, § 51); and Count IX alleges unjust enrichment.[4] On December 1, 2025, each Defendant moved to dismiss the complaint and filed a joint memorandum in support.  Doc. Nos. 13-16.  Ortolani opposed on January 14, 2026, Doc. No. 28, and Defendants replied on January 30, 2026, Doc. No. 31.  The Court held a hearing on the motions on June 18, 2026.

---

[4] In addition to these claims, Ortolani's complaint originally alleged a RICO claim (Count VIII). Doc. No. 1 ¶¶ 150-160.  However, during the motion hearing, at the request of Ortolani's counsel, the Court dismissed that claim with prejudice.  Doc. No. 36.

II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The court must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007).  The Court need not, however, "accept the complaint's legal conclusions or naked assertions devoid of further factual enhancement." Soto-Torres v. Fraticelli, 654 F.3d 153, 156 (1st Cir. 2011) (citation modified).

III.    DISCUSSION

The complaint advances eight different claims against Defendants, all of which arise from Ortolani's alleged experiences working on the Center's construction site.  As a preliminary matter, Defendants contend that the complaint is an impermissible "shotgun" pleading because it (1) groups Defendants together "in a conclusory fashion" without alleging any facts detailing what each Defendant did to implement the forced labor scheme, (2) does not allege that any Defendant is an alter ego of another, and (3) alleges wrongdoing by unidentified adult members of the Community without adequately tying their actions to Defendants.  Doc. No. 16 at 22-27.

The Court declines to dismiss the complaint on these grounds alone.  A "shotgun pleading" is a "pleading that fails to identify claims with sufficient clarity to enable a defendant to frame a responsive pleading." U.S. ex rel. Est. of Cunningham v. Millennium Lab. of Cal., Inc., 713 F.3d 662, 664 n.2 (1st Cir. 2013).  "[C]ourts within the First Circuit have routinely denied motions to dismiss complaints on shotgun pleading grounds unless they find that the

10

complaint was 'calculated to confuse the enemy and the court.'" Sogbuyi-Whitney v. Caremark PhC LLC, No. 23-cv-00055-MSM-LDA, 2024 WL 324552, at *2 (D.R.I. Jan. 29, 2024) (quoting Perrot v. Kelly, No. 18-cv-10147-DPW, 2023 WL 2939277, at *15 (D. Mass. Feb. 15, 2023), R. & R. adopted, No. 18-cv-10147-DPW, 2023 WL 2607763 (D. Mass. Mar. 23, 2023)).

While the complaint is light on factual details, it is not so confusing and vague as to impede a responsive pleading. Starting with Defendants' first objection, there is no general rule prohibiting group pleading, particularly where, as here, the plaintiff alleges that multiple defendants engaged in joint conduct in violation of the law. Nor is Ortolani required to allege that any Defendant acted as the alter ego of another. The complaint lays out that Defendants had a collective interest in constructing the Center, which was developed to host AEL's events and to promote the Community's artistic endeavors. Doc. No. 1 ¶¶ 23, 26. PABF was formed with the express purpose of supporting the construction of the Center. Id. ¶¶ 28-29. And, the complaint alleges that the Community, AEL, and PABF together coordinated the project to construct the Center—a project built on the unpaid labor of boys from the Community. Id. ¶¶ 61-63. More specifically, the complaint alleges that "AEL and PAB[F] were responsible for obtaining the land and loan for the building and overseeing much of the project," whereas the Community Leadership "was largely responsible for providing the person-power for the project." Id. ¶ 63.

These allegations of collective conduct among Defendants suffice to satisfy Rule 8's pleading standard. See Zond, Inc. v. Fujitsu Semiconductor Ltd., 990 F. Supp. 2d 50, 53 (D. Mass. 2014) (noting that "group pleadings are not, *prima facie,* excluded by Rule 8(a)" and that "a complaint generally will only be dismissed where it is entirely implausible or impossible for the grouped defendants to have acted as alleged" (citation modified)). In any event, even if Defendants "acted disparately" as to the challenged labor scheme, "those differences may be

11

explored during discovery and Defendants may argue at a later stage in the litigation that [Ortolani] cannot make the required evidentiary showing to support individual liability." Burke v. Walsh, No. 23-cv-11798-MGM, 2024 WL 3548759, at *6 (D. Mass. June 5, 2024). At the pleading stage, Ortolani has plausibly alleged the requisite involvement of each Defendant, at least for purposes of overcoming the shotgun-pleading argument.

Similarly, Defendants' argument that the complaint lacks allegations connecting the actions of the unidentified adults at the Center's worksite to Defendants does not warrant dismissing the complaint as a shotgun pleading. The complaint raises the reasonable inference that these adults were workers or supervisors on Defendants' construction site. To the extent Defendants contend that Ortolani needs to plead an agency relationship between the worksite adults and Defendants for some of his claims, the Court discusses this point when addressing the relevant claims below. Having dispensed with Defendants' overarching argument that the complaint reflects an improper "shotgun pleading," the Court turns to whether Ortolani has plausibly alleged his claims.

A.    TVPRA: Forced Labor

The Court begins with Counts I and II, which allege that Defendants violated the TVPRA's prohibition against forced labor. As relevant to Ortolani's claims, Section 1589 of the TVPRA creates criminal liability for any person who "knowingly . . . obtains the labor or services of a person" by forbidden means enumerated under the statute. 18 U.S.C. § 1589(a). While Section 1589 concerns criminal liability, Section 1595 of the TVPRA provides a civil right of action for victims of forced labor. Id. § 1595(a). In particular, Section 1595 opens the door to two types of civil liability. First, a plaintiff can bring a civil action against the perpetrator of a Section 1589 violation—that is, anyone who knowingly obtained the labor or services of a person by means outlawed by the provision. Id. Second, a plaintiff can bring a

12

civil action against a <u>beneficiary</u> of a Section 1589 violation—that is, anyone who "knowingly benefits . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an action in violation" of Section 1589. <u>Id.</u>

Ortolani brings claims of forced labor against Defendants under both theories of liability. Count I alleges direct liability for forced labor in violation of Section 1589, whereas Count II alleges beneficiary liability for the same violation.  The Court addresses these theories of liability in turn.

### 1.  *Direct Liability*

To survive dismissal on Count I, Ortolani must plausibly allege that Defendants knowingly obtained his labor by any one of, or by combination of, the following means: (1) "force, threats of force, physical restraint, or threats of physical restraint to that person or another person"; (2) "serious harm or threats of serious harm to that person or another person"; or (3) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. § 1589.

The complaint plausibly alleges that Ortolani was subjected to forced labor under the unlawful means enumerated in Section 1589.  According to the complaint, Ortolani was locked in the construction site from early morning to late night.  Doc. No. 1 ¶¶ 71-76.  He and the other boys were routinely subjected to various types of punishment if they tried to resist the program or faltered from their tasks.  <u>Id.</u> ¶¶ 77-78.  These punishments ranged from psychological humiliation (e.g., Light Sessions) to physical punishments (e.g., being ordered to run in steel-toed boots for hours during a hot day).  <u>Id.</u> ¶¶ 73, 79.  Expressing any type of pushback to the program had dire consequences.  The complaint alleges that Ortolani's own brother experienced

physical abuse and a six-month-long period of social ostracization after angering an adult at the worksite.  Id. ¶¶ 81-83.  Upon witnessing his brother's experience, Ortolani complied with the demands of the program, fearing a similar fate if he resisted.[5]  Id. ¶ 84.

These experiences plausibly allege "serious harm" under the TVPRA.  "[T]he TVPRA was enacted to encompass more subtle forms of psychological abuse and nonviolent coercion than those previously required to hold perpetrators accountable."  Bistline v. Parker, 918 F.3d 849, 871 (10th Cir. 2019).  Indeed, Section 1589 explains that the term "serious harm" means:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).  Therefore, the standard for assessing whether a harm is serious "is a hybrid" one: The TVPRA requires consideration of "the particular vulnerabilities of a person in the victim's position but also requires that [his] acquiescence be objectively reasonable under the circumstances."  United States v. Rivera, 799 F.3d 180, 187 (2d Cir. 2015).

The complaint satisfies this standard.  It alleges that Ortolani was only eleven years old when he began the work program.  See id. at 189 (noting that "objective conditions that make the victim especially vulnerable (such as youth or immigration status) bear on whether the employee's labor was obtained by forbidden means").  Moreover, Ortolani was raised in the Community, which demands strict obedience to its rules and discourages individualistic thinking.  Doc. No. 1 ¶¶ 31-33.  He also had minimal contact with the outside world.  Even outside of his

---

[5] Defendants contend that Noah's experience establishes that boys could voluntarily discontinue participation at the worksite.  Doc. No. 16 at 32-33.  This argument is misguided.  Drawing all reasonable inferences in favor of Ortolani, the allegations about Noah's experience support, rather than detract from, Ortolani's claim that he and the other boys were threatened with severe punishment if they attempted to oppose the work program in any manner.

long workday, Ortolani lived within the Community among other Community members, had limited access to the internet, and did not own a phone.  Id. ¶¶ 45-47, 54-55.  In light of these circumstances, it is plausible that any reasonable child in Ortolani's position would have continued to perform labor for Defendants in order to avoid the physical, social, and psychological punishments levied against anyone who resisted.  Accordingly, the Court finds that the complaint plausibly alleges that Ortolani was forced to provide labor under "threats of serious harm" as contemplated by the TVPRA.

But this does not conclude the Court's analysis on Count I.  A question remains—whether the complaint plausibly alleges that Defendants "knowingly obtained" Ortolani's labor through these means.  "The scienter element requires proof that the defendant knew (1) that the enumerated 'circumstance existed' and (2) that the defendant was obtaining the labor in question as a result."  Martinez-Rodriguez v. Giles, 31 F.4th 1139, 1156 (9th Cir. 2022) (quoting United States v. Calimlim, 538 F.3d 706, 711 (7th Cir. 2008)).  "That is, the employer must have intended the coercive pressure and its effects on the employee."  Id. at 1156-57.[6]

---

[6] Defendants raise that Ortolani's parents signed four agreements with AEL and PABF expressing their desire to have Ortolani participate in the work program as a volunteer.  Doc. No. 16 at 29-30.  Defendants aver that these agreements "effectively eviscerate Plaintiff's own claim under Count I" because they negate Defendants' knowledge of the forced labor.  Id. at 29.  This argument is unavailing.  As an initial matter, it is not evident that three of the agreements (Doc. Nos. 17-2, 17-3, 17-5), which are not mentioned in the complaint, can be considered by the Court at the dismissal stage.  In any event, the fact that Ortolani's parents signed agreements to have him participate in the work program for free does not preclude his forced-labor claim at this early stage of the case.  If Ortolani's only allegation underlying his forced-labor claim was that he provided free labor to Defendants, then the signed agreements volunteering him to engage in unpaid labor would certainly undermine any claim that the labor was "forced."  However, Ortolani's factual allegations span beyond that scenario—he alleges that he was locked at the worksite for extended hours of the day, deprived of educational opportunities, and subjected to severe punishment and threats of physical violence.  Doc. No. 1 ¶¶ 70-84.  He further alleges that his parents were unaware of these aspects of the work program when they signed the agreements.  Id. ¶¶ 68-69, 93.  Thus, there is no indication that Ortolani's parents volunteered him for the program with the knowledge that he would be subjected to threats of serious harm.  Moreover,

Here, the complaint plausibly alleges Defendants' knowledge.  The three Defendants worked together to coordinate the construction of the Center using the labor of boys from the Community through the "volunteer" work program.  Doc. No. 1 ¶¶ 61-68.  Defendants, who ran the construction project, plausibly knew about the forced-labor practices occurring at their own worksite.  The coercive tactics used at the worksite were not one-off occurrences.  Instead, they happened in plain sight on a frequent, widespread basis.  Id. ¶¶ 73, 77-80.  Some of these tactics, such as the daily Light Sessions, were integrated with the Community's practices.  Id. ¶ 73.

Furthermore, the allegations plausibly suggest that Defendants maintained tight control over the construction project, such that they would have known the inner workings of the worksite.  AEL and PABF were responsible for "overseeing" the construction project.  Id. ¶ 63.  Defendants installed large lights to enable the boys to work into the night hours.  Id. ¶ 74.  The Community Leadership also kept track of the boys' work hours, which it reported to the bank.  Id. ¶ 96.  Moreover, after misbehaving at the worksite, Noah was placed on Hard Times—a period of isolation that involves being relegated to the close watch of the Community Leadership.  Id. ¶¶ 41-44, 83.  Not to mention, the construction site was largely staffed by members of the Community, id. ¶ 63, whom the Community Leadership strictly monitored and controlled at all times, id. ¶¶ 31-53.  These facts support the reasonable inference that each Defendant was aware of the circumstances of the work program and intended both the coercive

---

the agreements may be invalid for violating state child labor laws.  See, e.g., Mass. Gen. Laws ch. 149, § 61 (prohibiting the employment of minor under sixteen for "heavy work in the building trades").  And, even assuming the agreements are valid, they simply raise the contrary possible inference that the work program was voluntary rather than forced.  They do not, at this stage, "eviscerate" the plausibility of Ortolani's claim of forced labor.

16

pressure and the resulting effect—that is, retaining the boys' free labor.[7]  For these reasons, the Court DENIES Defendants' motions to dismiss as to Count I.

### 2. *Beneficiary Liability*

Ortolani also plausibly brings a forced-labor claim against Defendants based on a theory of beneficiary liability.  As explained above, a plaintiff can sue a beneficiary of a Section 1589 violation—that is, anyone who (1) "knowingly benefits" "financially or by receiving anything of value"; (2) "from participation in a venture"; (3) "which that person knew or should have known has engaged in" forced labor.  18 U.S.C. § 1595(a).

Ortolani has plausibly alleged all three elements.  "The first element merely requires that the defendant knowingly receive a financial benefit." Reyes-Trujillo v. Four Star Greenhouse, Inc., 513 F. Supp. 3d 761, 793 (E.D. Mich. 2021) (citation modified).  Here, the complaint alleges that Defendants knowingly benefited from the forced-labor scheme because they did not have to pay for professional construction workers or abide by labor laws to construct the Center.  Doc. No. 1 ¶¶ 61, 66.  The Community Leadership received additional financial contributions from the bank by passing off the boys' work time as "volunteer hours."  Id. ¶¶ 96-97.

---

[7] Defendants contend that Ortolani has not adequately pled their knowledge of the forced-labor scheme because the actions of the adults who allegedly engaged in the coercive tactics at the worksite cannot be tied to Defendants.  Doc. No. 16 at 31.  They argue that Ortolani fails to plead "facts alleging that such unidentified individuals were agents or employees of any of the Defendants and acting within the scope of their employment such that Defendant could be charged with their knowledge under a theory of vicarious liability."  Id.  This argument fails for several reasons.  First, Defendants ignore the complaint's allegation that the construction site was supervised by "AEL and PAB[F]'s employees," many of whom "were also Community members."  Doc. No. 1 ¶ 63.  Second, and more importantly, Ortolani can proceed on Count I without establishing an agency relationship between Defendants and the adults on the worksite.  For all the reasons explained in the text, it is reasonable to infer from the allegations in the complaint that Defendants knew about and intended the widespread, coercive actions that occurred at their construction site.  Drawing all reasonable inferences in Ortolani's favor, the Court finds it plausible that Defendants "knowingly obtained" Ortolani's labor by prohibited means under the TVPRA.

17

The second element is also satisfied here.  "All that is required" to meet this element "is that Defendants participated in the same venture as [the perpetrators] in running or operating [the construction site]."  Rojas v. First Pick Farms LLC, 822 F. Supp. 3d 819, 845 (W.D. Mich. 2026); see also Doe #1 v. Red Roof Inns, Inc., 21 F.4th 714, 725 (11th Cir. 2021) (noting that "participation in a venture" requires that defendants "took part in a common undertaking or enterprise involving risk and potential profit").  As explained above, all three Defendants were involved in implementing, coordinating, and overseeing their common project of constructing the Center.

The complaint also plausibly pleads the final element.  "The phrase 'knew or should have known,' echoes common language used in describing an objective standard of negligence." Ricchio v. Bijal, Inc., 424 F. Supp. 3d 182, 193 (D. Mass. 2019).  Given that the complaint plausibly alleges Defendants' scienter for the direct-liability theory, the complaint necessarily meets the lower bar of negligence required for Ortolani's beneficiary-liability theory.  For these reasons, the Court also DENIES Defendants' motions to dismiss as to Count II.

B.    TVPRA: Trafficking

Next, Ortolani brings claims of trafficking under the TVPRA.  Section 1590 of the TVPRA places liability on whoever "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for" forced labor.  18 U.S.C. § 1590.  Under Section 1595, liability also extends to anyone who "knowingly benefits . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged" in trafficking.  18 U.S.C. § 1595.  As with his forced-labor claims, Ortolani brings his trafficking claims under theories of both direct and beneficiary liability.

18

1.    *Direct Liability*

"[I]f a defendant violates section 1589, he also violates section 1590 if he recruited the person to perform forced labor." Adia v. Grandeur Mgmt., Inc., 933 F.3d 89, 94 (2d Cir. 2019). "A corollary of that requirement is that for a plaintiff to plead a claim for trafficking with respect to forced labor, they must show that the defendant themselves took some action that could amount to coercing the plaintiffs." Lewis v. Monks of Most Blessed Virgin Mary of Mount Carmel, No. 23-cv-202-KHR, 2024 WL 3374140, at *6 (D. Wyo. July 11, 2024). Furthermore, unlike "force[d] labor claims, which focus on the illicit means of maintaining subjugation, trafficking claims under Section 1590 focus on how a victim was initially subjugated." Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc., No. 19-cv-1422-WFK-RER, 2021 WL 7186030, at *9 (E.D.N.Y. Apr. 30, 2021).

Ortolani argues that Defendants are directly liable under § 1590 because they knowingly (1) "recruited him to join their work program by requiring that all boys between the ages of nine and sixteen whose parents were members of the [Community] participate in renovating AEL's storage facilities and then building the Center"; (2) harbored him by concealing "the true nature of the forced labor project through their waivers" and "by hiding [the boys] away when inspectors visited the site for the purpose of continuing the . . . boys' forced labor"; and (3) "obtained . . . him for the purposes of carrying out forced labor." Doc. No. 28 at 32-34.

Though this claim presents a closer call, the Court finds that Ortolani has plausibly alleged his first theory—that Defendants knowingly recruited him to perform forced labor.[8] The

---

[8] The Court is less persuaded by Ortolani's other two theories. As for the harboring theory, Ortolani provides no case law establishing that concealing the nature of a work program and hiding individuals for a temporary period amounts to "harboring" under the TVPRA. Ortolani cites to one non-binding case where the district court found that a hotel's action in renting a room to a trafficking victim amounted to harboring the victim under the TVPRA. Doe (K.R.D.) v. Hilton Worldwide Holdings Inc., 798 F. Supp. 3d 1082, 1099 (N.D. Cal. 2025). The court

complaint alleges that the Community Leadership instructed all boys aged nine to sixteen to sign up for the work program.  Doc. No. 1 ¶¶ 64-65.  While Defendants frame the construction project as a "voluntary" program, the fact that all boys of a certain age were required to participate—coupled with the complaint's other allegations about the high degree of obedience demanded by the Community Leadership—colors the recruitment with a coercive hue.

Moreover, the complaint indicates that Defendants misled Ortolani's parents about the nature of the program in order to recruit his labor, adding further support to Ortolani's claim that the recruitment process was coercive.  For one, nothing in the written agreement provided by PABF to Ortolani's parents disclosed the actual conditions and practices of the work program (as alleged in the complaint), such as the hours that the participants would have to work each day or the punishments they would have to endure.  Id. ¶ 68; see also Doc. No. 17-4.[9]  Furthermore, the complaint alleges that Defendants "invented fake course descriptions" to create the impression to parents that the boys would receive an education on the worksite when, in reality, the work program provided scarce educational activities.  Doc. No. 1 ¶¶ 93-95.  In fact, Defendants eventually closed the work program out of concern about "potential legal liability for keeping the boys out of school for so long."  Id. ¶ 101.  That Defendants misled parents and the boys about

---

acknowledged that the term "harbor" means "to receive secretly and conceal" in the context of an unrelated, immigration statute but decided the TVPRA claim on a different interpretation of the term.  Id. (noting that "harbor" means "to give shelter and refuge to").  This case does not support Ortolani's theory that hiding the boys from inspectors and concealing the nature of the program, standing alone, amount to "harboring" under Section 1590.  Ortolani's remaining theory—that Defendants "obtained" him for the purposes of carrying out forced labor—appears to regurgitate his forced-labor claim under Section 1589 without alleging a distinct violation.  See Aguirre v. Best Care Agency, Inc., 961 F. Supp. 2d 427, 447 (E.D.N.Y. 2013) (rejecting Section 1590 claim where "Plaintiff's trafficking claim under this statute is nothing more than her forced labor claim restated").

[9] The release signed by Ortolani's father on October 4, 2020, Doc. No. 17-4, is quoted and relied upon by the complaint, Doc. No. 1 ¶ 68, and is thus incorporated by reference.

the educational opportunities available on the construction site as part of their recruitment efforts plausibly gives rise to a Section 1590 claim.  Cf. A.A. v. Omnicom Grp., Inc., No. 25-cv-3389-JMF, 2026 WL 504904, at *15 (S.D.N.Y. Feb. 24, 2026) (noting that false promises of particular working conditions "can constitute knowing recruitment within the meaning of Section 1590").  Accordingly, the motions to dismiss Count III are DENIED.

### 2.    *Beneficiary Liability*

The Court also finds that Ortolani has plausibly pled a trafficking claim under a theory of beneficiary liability.  First, Defendants knowingly benefited from the coercive recruitment process because the compulsory participation of the Community boys allowed them to obtain free labor from an "entirely captive population."  Doc. No. 1 ¶ 66.  Second, Defendants participated in the same venture (namely, the construction of the Center).  Lastly, the complaint plausibly alleges that Defendants knew or should have known that the venture engaged in coercive recruiting, given that they were the ones who made false representations about the work program's educational offerings.  For these reasons, the Court DENIES the motions to dismiss Count IV.

### C.    TVPRA: Attempt and Conspiracy

Ortolani further alleges that Defendants are liable for attempting and conspiring to violate the TVPRA's forced labor and trafficking provisions (Sections 1589 and 1590).

To plead a claim of attempt, Ortolani must plausibly allege "both an intent to commit the substantive offense and a substantial step toward its commission."  United States v. Turner, 501 F.3d 59, 68 (1st Cir. 2007) (citation modified); see also Ricchio v. McLean, 853 F.3d 553, 557 (1st Cir. 2017) (relying on criminal-law doctrine of attempt in evaluating attempt claim under TVPRA).  Ortolani has sufficiently pled these elements for much the same reasons explained above for the direct-liability claims of forced-labor and trafficking.  The complaint plausibly

alleges that Defendants intended to obtain free labor for their construction project using coercive recruitment and retention tactics. The complaint also alleges that Defendants took steps toward carrying out this scheme. Accordingly, the Court DENIES the motions to dismiss Count V.

As for the conspiracy claim, the TVPRA does not define conspiracy. But when a term has a familiar meaning within the common law, courts "generally presume that such common-law terms bring the old soil with them." Twitter, Inc. v. Taamneh, 598 U.S. 471, 484 (2023) (citation modified). Massachusetts law recognizes two types of civil conspiracy, the "so-called 'true conspiracy' and conspiracy based on section 876 of the Restatement (Second) of Torts." Taylor v. Am. Chemistry Council, 576 F.3d 16, 34 (1st Cir. 2009). To state a claim for the first type of conspiracy, "plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994). The second type of civil conspiracy reflects a "form of vicarious liability for the tortious conduct of others." Taylor, 576 F.3d at 34. "To prevail, Plaintiffs must show either a common design or substantial assistance in furtherance of a tortious act." Steiner v. eBay, Inc., 795 F. Supp. 3d 144, 175 (D. Mass. 2025).

Here, Ortolani has adequately pled the second type of civil conspiracy under a "common design" theory. Under this theory, a plaintiff must show "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." Thomas v. Harrington, 909 F.3d 483, 490 (1st Cir. 2018). Ortolani plausibly alleges that Defendants formed a common plan to build the Center by recruiting and obtaining Ortolani's labor through coercive means. Furthermore, Ortolani alleges that there were tortious acts in furtherance of the common plan.

22

Defendants jointly recruited the boys' labor using false promises of educational programming and they jointly operated the work program, which employed frequent, coercive tactics against its child laborers.  Based on these allegations, the Court DENIES the motions to dismiss as to Count VI.

        D.      <u>State Labor Trafficking Claim</u>

Ortolani also brings a claim under Massachusetts's labor trafficking law ("Section 51(a)").  Section 51(a) allows a victim to pursue civil claims against

> [w]hoever knowingly: (i) subjects, or attempts to subject, another person to forced services, or recruits, entices, harbors, transports, provides or obtains by any means, or attempts to recruit, entice, harbor, transport, provide or obtain by any means, another person, intending or knowing that such person will be subjected to forced services; or (ii) benefits, financially or by receiving anything of value, as a result of a violation of clause (i).

Mass. Gen. Laws ch. 265, § 51(a).  "Forced services" is further defined as

> services performed or provided by a person that are obtained or maintained by another person who: (i) causes or threatens to cause serious harm to any person; (ii) physically restrains or threatens to physically restrain another person; (iii) abuses or threatens to abuse the law or legal process . . . or (vi) causes or threatens to cause financial harm to any person.

Id. § 49.

There is limited case law on Section 51(a).  Nonetheless, because the language of Section 51(a) closely mirrors the TVPRA, another Judge in this District has relied on case law about the TVPRA when evaluating claims under Section 51(a).  <u>See</u> <u>McClain v. Cape Air</u>, No. 22-cv-10649-DJC, 2023 WL 8602944, at *5 (D. Mass. Dec. 12, 2023).  The parties agree that the TVPRA provides applicable guidance on the Section 51(a) claim.  Doc. No. 16 at 45; Doc. No. 28 at 40.  Following suit, this Court finds that Ortolani has plausibly alleged his Section 51(a) claim for the same reasons his TVPRA claims survive dismissal.  Therefore, the Court DENIES the motions to dismiss as to Count VII.

E.    Unjust Enrichment

Finally, Ortolani brings a claim of unjust enrichment.  "To plausibly state a claim for unjust enrichment, the plaintiff must allege: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value."  Tomasella v. Nestle USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (citation modified).

Ortolani has plainly pled the first two elements.  He alleges that he conferred a benefit on Defendants by performing free construction work for the Center.  Defendants were aware of this benefit.  Indeed, they extended the work program multiple times based on its success.  Doc. No. 1 ¶ 67.  Doing so allowed them to save money on staffing their construction projects.  Id. ¶ 97. The Community Leadership also reported the work hours of Ortolani and the other boys to its bank as volunteer hours, which allowed it to reap additional financial benefits.  Id. ¶ 96.  Cf. Ross v. Jenkins, 325 F. Supp. 3d 1141, 1169-70 (D. Kan. 2018) (entering default judgment on former religious community member's claim for unjust enrichment based on unpaid labor she performed for religious community).

The third element is less clear-cut.  Under Massachusetts law, whether Defendants' retention of a benefit is inequitable or unjust "turns on the reasonable expectations of the parties."  Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850 (Mass. 2013).  Defendants contend that Ortolani "cannot plausibly allege that he reasonably expected compensation from each Defendant for his work" because the agreements signed by his parents explicitly stated that "there will be no payment for services."  Doc. No. 16 at 48.  Relatedly, they argue that Ortolani cannot recover on an unjust-enrichment theory because there are valid agreements signed by his parents that govern the subject matter.  Id. at 49; see also Guldseth v. Fam. Med. Assocs. LLC,

24

45 F.4th 526, 541 (1st Cir. 2022) ("A plaintiff is not entitled to recovery on an unjust-enrichment or quantum-meruit theory where there is a valid contract that covers the same subject matter and defines the obligations of the parties.").

There are several gaps in Defendants' arguments.  As explained above, the complaint alleges that Defendants created the false impression that Ortolani would receive educational programming on the worksite.  Doc. No. 1 ¶¶ 93-95.  In addition, the complaint indicates that Ortolani and his parents were not informed of the true conditions of the worksite or the harsh treatment that Ortolani would have to endure.  Id. ¶ 69.  It is thus plausible that, had Ortolani and his parents understood the realities of the work program, they would have reasonably expected compensation for Ortolani's labor (or, alternatively, opted out of conferring the benefit on Defendants).  Moreover, the existence of a signed agreement or waiver does not foreclose Ortolani's unjust-enrichment claim at this early stage of the proceedings.  An express contract "does not bar an action for unjust enrichment if the contract is invalid or otherwise unenforceable by reason of fraud, misrepresentation, mistake, illegality, indefiniteness, [or] incapacity." Broderick v. PNC Mortg. Corp., No. 11-cv-10047-JLT, 2013 WL 1187111, at *3 (D. Mass. Mar. 20, 2013).  Here, it remains a fact question whether any agreement signed by Ortolani's parents for the work program constitutes an enforceable, valid agreement.  See supra note 6.  Under these circumstances, the Court DENIES the motions to dismiss Count IX.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss, Doc. Nos. 13-15, are

DENIED.  The Clerk shall schedule a Rule 16 conference in this matter.


SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge

26